IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Joseph Pfeifer,                    :
           Petitioner            :
                                    :
        v.                       :    No. 755 C.D. 2023
                                      :
Temple University Hospital, Inc.     :
(Workers' Compensation Appeal    :
Board),                               :
           Respondent       :    Submitted: September 9, 2024

BEFORE:    HONORABLE ELLEN CEISLER, Judge
                 HONORABLE LORI A. DUMAS, Judge
                 HONORABLE MARY HANNAH LEAVITT, Senior Judge

<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION
BY JUDGE CEISLER                                FILED: October 18, 2024

Joseph Pfeifer (Claimant) petitions this Court, *pro se*, for review of the May 23, 2023 order of the Workers' Compensation Appeal Board (Board), affirming the decision of a workers' compensation judge (WCJ) that terminated Claimant's workers' compensation benefits based on a finding that Claimant had fully recovered from his work injury. On appeal, Claimant argues that the WCJ relied on evidence in violation of Claimant's right to free political speech under the First Amendment of the United States Constitution,[1] and that the WCJ's findings were inconsistent with "known science" and were based on equivocal medical testimony.[2] After careful review, we affirm.

---

[1] The First Amendment to the United States Constitution relevantly provides that "Congress shall make no law . . . abridging the freedom of speech[.]" U.S. Const. amend. I.

[2] Claimant's Br. at 16. We have combined Claimant's arguments to the extent they overlap.

## I. Background

Claimant contracted COVID-19 in September 2020 while employed as a registered nurse for Temple University Hospital, Inc. (Employer). Employer accepted Claimant's work injury through issuance of a Notice of Temporary Compensation Payable (NTCP) on October 27, 2020, which converted to a Notice of Compensation Payable (NCP) by operation of law.[3]

Employer filed a Petition to Terminate Claimant's workers' compensation benefits (Termination Petition) on June 2, 2021, alleging that Claimant had fully recovered from his work injury and that he was able to return to work without restrictions. On October 11, 2021, Employer filed a Petition to Suspend Claimant's workers' compensation benefits (Suspension Petition), based on a specific job offer made on June 15, 2021. Claimant denied the allegations in both petitions.

In support of its petitions, Employer presented the September 28, 2021 deposition testimony of Richard Bennett, M.D., a neurologist who conducted an independent medical examination (IME) of Claimant on April 28, 2021, and submitted video surveillance footage taken of Claimant in April and June 2021, as well as copies of Claimant's social media posts, in which Claimant questioned the severity of COVID-19 and suggested that the manner in which the federal government handled the COVID-19 pandemic was politically motivated. Claimant testified by deposition on August 20, 2021, and live at a hearing conducted by the

---

[3] Pursuant to Section 406.1(d)(1) of the Workers' Compensation Act (Act), Act of June 2, 1915, P.L. 736, *as amended*, added by the Act of February 8, 1972, P.L. 25, 77 P.S. § 717.1(d)(1), an employer that is unsure whether a claim is compensable under the Act may initiate compensation payments without admitting liability by issuing an NTCP. If the employer does not either admit or deny liability within 90 days, Section 406.1(d)(6) of the Act provides that the employer is deemed to have admitted liability and the NTCP converts to an NCP. 77 P.S. § 717.1(d)(6).

2

WCJ on May 17, 2022. Claimant also presented the January 25, 2022 deposition testimony of one of his treating physicians, Geoffrey W. Temple, D.O.

## A. Employer's Evidence

The video surveillance footage from April 2021 depicts Claimant driving his car and traveling to multiple locations, including a seafood restaurant, McDonald's, Kohl's, and CVS. The report derived from the April 2021 footage states that Claimant "appeared to move with no visible signs of restriction or restraint." Certified Record (C.R.)., Item No. 29. In the June 2021 video surveillance footage, Claimant is observed positioning wooden logs in the driveway of a residence, using a leaf blower around the property, carrying a countertop out of the residence, and cleaning windows. The report summarizing the June 2021 footage notes that Claimant moved "with no visible signs of restriction or restraint." *Id.*

Employer presented copies of several social media posts Claimant made regarding the COVID-19 pandemic, which Claimant referred to as a "plandemic." C.R., Item No. 22. Although a few of Claimant's posts were made prior to his COVID-19 diagnosis, the majority were posted during the period of October 2020 through April 2021. Claimant's posts generally consisted of memes questioning the danger presented by COVID-19. An October 23, 2020 post, for example, stated, "I'd tell you a COVID[-19] joke, but there[']s a 99.696% chance you won[']t get it." *Id.* On November 12, 2020, Claimant reposted a meme stating that a COVID-19 vaccine was announced "literally the next business day after [President Joe] Biden claimed victory[.]" *Id.* A March 3, 2021 post suggested that "[t]he media" made COVID-19 "so dangerous[.]" *Id.*

Finally, Employer presented Dr. Bennett's January 25, 2022 deposition testimony. During the April 28, 2021 IME, Claimant provided a history that he

contracted COVID-19 on September 20, 2020, and that he had not returned to work since that date. Claimant related that he suffered from dizziness, chronic daily headaches, and ringing in his ears, and that he would occasionally lose his balance. He could drive a car and perform household chores, such as mowing the grass, when he felt well. During the IME, Claimant expressed the opinion that he had "long haul effects" of COVID-19 (Long COVID). C.R., Item No. 25, Bennett Dep. at 14. Dr. Bennett explained that blood tests do not exist that could prove or disprove this condition; therefore, Dr. Bennett had to rely on the history Claimant provided.

Claimant's medical history included bilateral total knee replacements, a hernia repair, a right rotator cuff repair, type-2 diabetes, depression, and high blood pressure. On the date of Dr. Bennett's examination, Claimant reported taking aspirin, ibuprofen, cozaar, metformin, and AcipHex. Dr. Bennett performed a physical neurological examination, during which Claimant appeared "alert, aloof, and somewhat anxious." *Id.* at 9. Although Claimant complained of ringing in his ears, he did not have difficulty hearing, and Claimant could "follow and understand everything." *Id.* at 10. Dr. Bennett observed that Claimant spoke clearly. Dr. Bennett performed a cranial examination, which yielded normal results, as well as motor, sensory, coordination, and balance evaluations, which revealed no objective findings. Dr. Bennett described the examination as normal "for all intents and purposes" with "no findings at all." *Id.* As for any residual issues from COVID-19, Dr. Bennett stated that the examination "appeared to be entirely normal." *Id.* at 12.

Dr. Bennett reviewed Claimant's medical records, including reports from Claimant's family doctor, William Madison, M.D., who diagnosed Claimant with COVID-19 on September 27, 2020. Dr. Bennett noted that Claimant's medical records contained "several reports" indicating that Claimant had been cleared to

return to work, including a December 11, 2020 report from Dr. Madison releasing Claimant to work as of January 18, 2021. *Id.* at 13. A magnetic resonance imaging (MRI) study of Claimant's brain was normal. Following a January 14, 2021 appointment with Dr. Madison, Claimant was prescribed "migraine-specific medications . . . to deal with chronic migraines[.]" C.R., Item No. 28. Dr. Bennett also reviewed surveillance video taken of Claimant over several days in April and June 2021. Dr. Bennett noted a marked discrepancy between Claimant's reported symptoms, which Dr. Bennett considered subjective, and the activities Claimant performed in the surveillance videos that indicated Claimant "was perfectly normal." C.R., Item No. 25, Bennett Dep. at 16. These activities included driving, shopping, and removing a "very large backpack or leaf blower from his vehicle." *Id.* Given Claimant's ability to perform activities at times when he did not realize he was being observed, Dr. Bennett opined that Claimant had fully recovered from COVID-19, and he could return to work without restrictions.

During cross-examination, Dr. Bennett agreed that Long COVID can include fatigue, difficulty concentrating, headaches, dizziness, mood changes, and difficulty sleeping. Dr. Bennett acknowledged that the IME report he authored on April 28, 2021 indicated that Claimant could return to work "with certain restrictions for the time being with the intention that he would be able to return to full duty." C.R., Item No. 28. The restrictions recommended by Dr. Bennett included carrying less than 10 pounds and limiting physical activity to 1-3 hours. Dr. Bennett authored a supplemental IME report, however, after reviewing the surveillance videos and Claimant's social media posts, in which Claimant stated that the COVID-19 pandemic was, by Dr. Bennett's interpretation, "exaggerated and a politically motivated hoax." *Id.* Dr. Bennett opined that the surveillance videos depicted

Claimant "performing normal activities [that] do not reflect any impairment." *Id.* Accordingly, Dr. Bennett felt that Claimant had "clearly achieved full recovery and [did] not require any additional treatment or diagnostic testing and would be capable of working without restrictions as a nurse." *Id.*

## B. Claimant's Evidence

Claimant testified at the August 20, 2021 deposition that he contracted COVID-19 in September 2020 while working in the emergency room. Claimant advised that several nurses and staff had been diagnosed with COVID-19 at that time. He last worked on September 20, 2020. On September 23, 2020, Claimant woke up with flu-like symptoms, such as fever and chills, which persisted for six or seven days. While his initial symptoms ceased after a week, Claimant began to experience piercing headaches and dizziness, followed by fatigue and brain fog. Claimant also lost his sense of smell, had difficulty sleeping, and developed "crushing depression[.]" C.R., Item No. 26, Claimant Dep. at 13. He denied ever losing his sense of taste. Claimant had not experienced these symptoms prior to having COVID-19. Claimant's family physician, Dr. Madison, referred Claimant to an infectious disease specialist, who agreed with the treatment Dr. Madison provided. Dr. Madison also referred Claimant to a neurologist, Anca Popescu, who ordered an MRI and lab work. Claimant last met with Dr. Popescu in February 2021. Claimant began treating with Dr. Temple on August 10, 2021, to investigate any treatment that could "get [him] better." *Id.* at 22.

Claimant continues to experience fatigue and shortness of breath with activity. He can drive for short periods, although he gets tired afterwards. Claimant acknowledged the surveillance videos in which he ran errands and performed various activities. Claimant advised that he can engage in "some activities" but

6

stated that he does "as little as he can" and he must nap after two hours of activity. *Id.* at 25. Claimant would like to return to work, but his doctor has indicated that Claimant is "not ready."[4] *Id.* at 27. When asked about his social media posts on the COVID-19 pandemic, Claimant stated that he usually posts in the middle of the night when he cannot sleep and he will "say anything just to get a laugh." *Id.* at 29. Claimant agreed that COVID-19 was "very real." *Id.*

At the May 17, 2022 hearing before the WCJ, Claimant stated that he has not worked since September 20, 2020, due to his physical problems and "brain injury" caused by COVID-19. C.R., Item No. 16, Notes of Testimony (N.T.) at 16. Claimant's symptoms have not improved and have worsened "in some respects[.]" *Id.* at 17. Claimant experiences what he calls "sea legs[,]" where he feels like the room is moving. *Id.* When walking down the hallway at night, Claimant uses the wall for balance. Claimant described a fall in April 2021 that resulted in a fractured coccyx. Claimant suffers from constant headaches, which he treats with Motrin and Tylenol, and dizziness, as well as loss of smell, ringing in his ears, loss of balance, fatigue, skin issues, and brain fog. Claimant related that he attended law school early in his nursing career but went back to nursing "because it was [his] passion." *Id.* at 15. Although Claimant intended to go back to "the law" when he could no longer meet the physical requirements of nursing, Claimant believed that it was no longer an option "with [his] brain being scrambled[.]" *Id.* at 15-16. Claimant takes Motrin and Tylenol for headache pain.

Claimant continues to treat with Dr. Temple, who offers "suggestions and advice." *Id.* at 27. Claimant also sees a neurologist, Robert Sammartino, who prescribed Cymbalta to address Claimant's headaches. Claimant sees Dr.

---

[4] Claimant did not identify which doctor expressed this opinion.

7

Sammartino "every two months or so." *Id.* at 21. Claimant reiterated that he would like to return to work but his doctor has refused to release him.[5] Regarding Dr. Bennett's April 28, 2021 IME, Claimant asserted that 10 minutes into the evaluation, Dr. Bennett stated there was "nothing wrong with" him. *Id.* at 30-31. Claimant maintained that his current symptoms did not arise until after he had COVID-19.

During cross-examination, Claimant agreed he was never hospitalized for COVID-19 or placed on a ventilator. Claimant conceded that he previously took Adderall for "mild attention stuff;" however, Claimant also understood that it would help Claimant with weight gain. *Id.* at 36. Claimant acknowledged that he has taken Percocet for 20 years due to herniated discs. Although Claimant initially indicated that he followed up with the Penn Medicine COVID-19 clinic, he later testified that his experience was limited to a phone call and lab work. Claimant acknowledged that he is licensed to practice law in New Jersey and Pennsylvania, although Claimant reiterated his belief that he could not practice law "with [his] scrambled brain[.]" *Id.* at 41. Claimant dismissed the continuing education requirements for practicing law as "not that hard." *Id.*

Dr. Temple, a primary care physician, testified that Claimant presented at his August 10, 2021 appointment with residual fatigue and headaches, which had intensified since Claimant's COVID-19 diagnosis in September 2020. Claimant advised Dr. Temple that he suffered from dizziness that made him feel "like [he was] on a boat[.]" C.R., Item No. 18, Temple Dep. at 10. Due to fatigue, Claimant slept 8 to 10 hours per day, which made it difficult for Claimant to focus on "tasks at hand." *Id.* at 11. Claimant also experienced forgetfulness. Claimant's wife, who accompanied Claimant to the appointment, stated that Claimant had difficulty

---

[5] Claimant did not identify which of his treatment providers declined to release him to work.

finding words and she had to repeat conversations. Dr. Temple understood that Claimant was not working in any capacity.

Claimant was oriented to person, place, and time during the examination. The result of a balance test was equivocal, and Dr. Temple felt that Claimant required more comprehensive neuropsych and neurology evaluations. Dr. Temple reviewed Claimant's medical records, including a work release status form dated January 21, 2021, which stated that Claimant could not return to work pending response to further treatment. Dr. Temple believed that Dr. Madison signed the form, although he could not be sure. The report from a January 28, 2021 IME conducted by "Dr. Silverman" concluded that Claimant required further care but could return to work in a modified schedule of four hours per day, three days per week. *Id.* at 16. Dr. Silverman's IME report reflected that Claimant's initial COVID-19 symptoms included loss of taste. MRIs taken on January 13, 2021, and October 13, 2021, were unremarkable. An October 7, 2021 note from Dr. Madison released Claimant to return to work.

Dr. Temple understood that Claimant treated with Dr. Sammartino, a neurologist from New Jersey, and Dr. Popescu, who administered occipital nerve injections to treat Claimant's headaches. A note from Dr. Popescu indicated that the injections did not help. Dr. Temple felt that Claimant's headaches were a consequence of his COVID-19 infection, in part because the occipital nerve injections failed to alleviate Claimant's headache symptoms, and because Claimant's MRI scans did not reveal any acute intercranial pathology. To Dr. Temple, these findings supported a diagnosis that Claimant had Long COVID. *Id.* at 23. Dr. Temple defined a Long COVID patient as an individual suffering from residual COVID-19 symptoms that have not resolved within four to six weeks.

9

Claimant's symptoms were consistent with the Long COVID symptoms Dr. Temple had observed in other patients. Claimant's symptoms were unchanged at a January 2022 examination, and Dr. Temple opined that Claimant had not fully recovered from COVID-19, nor was he capable of returning to work as a registered nurse.

During cross-examination, Dr. Temple acknowledged that Claimant did not have an active COVID-19 infection; however, he related that a negative COVID-19 test did not rule out Long COVID. Dr. Temple agreed that Claimant had been prescribed Adderall in the past to treat attention deficit hyperactivity disorder (ADHD), and he recognized that one of the symptoms of ADHD is difficulty concentrating and focusing. Dr. Temple agreed that Claimant's neurological examination from August 10, 2021, was normal, and the test for balance loss was not strongly positive. Based on his review of Claimant's records, Dr. Temple understood that Claimant had not treated with any neurologist between February 2021 and September 2021. Dr. Temple conceded that a February 2021 note from Dr. Popescu's office indicated that Claimant self-reported drinking a bottle of red wine every day to help with anxiety and headaches. A September 15, 2021 note from Dr. Sammartino reflected that Claimant denied any balance difficulties, dizziness, fainting spells, memory loss, numbness or tingling, anxiety, or difficulty sleeping. Dr. Temple acknowledged that he released Claimant to work, with restrictions, on January 17, 2022, despite the lack of improvement in his symptoms.

## C. WCJ Decision

In a decision circulated on October 28, 2022, the WCJ credited the testimony of Dr. Bennett over that of Dr. Temple. The WCJ noted that Dr. Temple acknowledged he did not perform a comprehensive neurological evaluation and was unable to identify a single positive objective finding during his physical examination

10

of Claimant. Initially, Dr. Temple found Claimant's cognitive issues prevented his return to work. Although Claimant did not report an improvement in his symptoms, Dr. Temple later released Claimant to work in a modified-duty capacity, suggesting that Claimant possessed the cognitive functioning required of a registered nurse. This work release conflicted with Claimant's own testimony that he could not return to work as a registered nurse. By contrast, the WCJ found Dr. Bennett's opinions to be consistent and unequivocal and supported by the objective surveillance video depicting Claimant participating in various activities of daily living, such as operating a motor vehicle, performing yard work, and moving freely without any visual evidence of balance issues.

The WCJ rejected Claimant's testimony as not credible, unpersuasive, and lacking in candor. The WCJ specifically rejected Claimant's contention that he continued to suffer from any disabling symptoms of COVID-19, noting that Claimant's complaints were not objectively verifiable and, therefore, must be compared with the evidence of record. In that regard, Claimant reported multiple complaints and symptoms that he related to COVID-19, while simultaneously deriding and downplaying the impact of COVID-19 in his social media posts, which repeatedly described the COVID-19 pandemic as sensationalized and exaggerated. The WCJ described Claimant's posts making light of COVID-19 with his allegations that COVID-19 had "completely and totally disabled him" as "one of the starkest contrasts . . . between a witness' in-court and out-of-court statements[.]" C.R., Item No. 9, Finding of Fact (F.F.) No. 10. Additionally, the WCJ found that Claimant provided inconsistent complaints to his medical providers. Although Claimant denied experiencing balance issues, dizziness, fainting spells, memory loss, numbness, tingling, anxiety, and difficulty sleeping when he provided a history to

11

Dr. Sammartino on September 15, 2021, Claimant later testified to having many of those symptoms. Despite claims that he is not mentally competent to work as a registered nurse, Claimant maintains active law licenses in Pennsylvania and New Jersey. Claimant alleged life-altering symptoms due to COVID-19 but failed to comply with Dr. Temple's recommendation that he follow up with Penn Medicine's COVID-19 clinic. Claimant's belief that he could not work in any capacity was contradicted by his own medical expert, who released Claimant to work with modified restrictions. The WCJ also noted that Claimant did not seek treatment with Dr. Temple until August 10, 2021, and he was never hospitalized by his COVID-19 symptoms. The surveillance video depicted Claimant performing a variety of activities without difficulty contrasted with Claimant's alleged total disability. Finally, the WCJ personally observed Claimant's manner and demeanor while testifying, which she found to be exaggerated and disingenuous.

Based on her findings and credibility determinations, the WCJ found that Claimant had fully recovered from his work injury as of April 28, 2021, the date of Dr. Bennett's IME. Accordingly, the WCJ granted Employer's Termination Petition and dismissed the Suspension Petition as moot.

Claimant appealed to the Board, arguing that the WCJ's findings and conclusions were unsupported by the evidence and that the WCJ improperly considered his social media posts when evaluating whether Claimant had fully recovered from COVID-19. Claimant also challenged the WCJ's credibility determinations.

The Board rejected Claimant's arguments, stating that "questions of credibility, conflicting medical evidence, and evidentiary weight are left to the WCJ." C.R., Item No. 12 at 13. Regarding the admissibility of Claimant's social

12

media posts, the Board noted that this evidence was admitted without objection. As a result, the issue was waived. Therefore, the Board affirmed the WCJ. This appeal followed.[6]

## II. Issues

Claimant argues on appeal that the WCJ's reliance on Claimant's social media posts violated his First Amendment right to free speech, and that the WCJ's findings were inconsistent with the current understanding of Long COVID and were based on the equivocal testimony of Dr. Bennett.

## III.    Discussion

To succeed in a termination petition, an employer bears the burden of proving by substantial evidence that a claimant's disability has ceased or that any remaining conditions are unrelated to the work injury. *Westmoreland Cnty. v. Workers' Comp. Appeal Bd. (Fuller)*, 942 A.2d 213, 217 (Pa. Cmwlth. 2008). The employer satisfies this burden when its medical expert unequivocally testifies, within a reasonable degree of medical certainty, that the claimant has fully recovered and can return to work without restrictions, and that there are no objective medical findings to either substantiate the claims of pain or connect them to the work injury. *Udvari v. Workmen's Comp. Appeal Bd. (USAir, Inc.)*, 705 A.2d 1290, 1293 (Pa. 1997). The WCJ may terminate benefits only if the WCJ finds that the claimant is fully recovered from all aspects of the work injury. *Central Park Lodge v. Workers' Comp. Appeal Bd. (Robinson)*, 718 A.2d 368, 370 (Pa. Cmwlth. 1998).

---

[6] Our review is limited to determining whether the WCJ's findings of fact were supported by substantial evidence, whether an error of law was committed, or whether constitutional rights were violated. *Zuchelli v. Workers' Comp. Appeal Bd. (Ind. Univ. of Pa.)*, 35 A.3d 801, 804 n.2 (Pa. Cmwlth. 2011).

## A. Admissibility of Claimant's Social Media Posts

First, Claimant argues that the WCJ erred in relying on Claimant's social media posts suggesting that the danger posed by COVID-19 had been exaggerated. Claimant contends that his social media posts represent constitutionally protected free speech that "should not be weaponized and curtailed" to strip Claimant of his workers' compensation benefits. Claimant's Br. at 13. Claimant maintains that his COVID-19-related social media posts were made before Long COVID was understood and the posts were aimed at "a very limited audience[.]" *Id.* at 12. Additionally, Claimant denies that he failed to object to the social media posts when introduced by Employer. Claimant does not provide any legal authority to support his argument that the social media posts should not have been introduced into evidence or relied upon by the WCJ.

A party that fails to object to the admissibility of evidence cannot object to its admission on appeal. *Rossa ex rel. Rossa v. Workers' Comp. Appeal Bd. (City of Phila.)*, 794 A.2d 919, 926 (Pa. Cmwlth. 2002). Having reviewed the record, we reject Claimant's assertion that he objected to the introduction of Claimant's social media posts. Claimant was represented by counsel before the WCJ. Notably, Claimant's counsel did not object to the introduction of Claimant's social media posts, which Claimant has not denied authoring. During his deposition testimony, Claimant challenged Employer's characterization of his social media posts, stating that he was "kind of a bomb thrower[,]" and that he would "say anything just to get a laugh." C.R., Item No. 26, Claimant Dep. at 29. At no point, however, did Claimant, or his counsel, object to the admissibility of these posts. Accordingly, we agree with the Board that Claimant has waived the issue.

14

Even if we disagreed with the Board's conclusion that the issue is waived, Claimant's social media posts were not the WCJ's sole basis for rejecting his testimony as not credible, unpersuasive, and lacking in candor. Indeed, the WCJ cited a litany of reasons, which included Claimant's manner and demeanor while testifying at the May 17, 2022 hearing. The WCJ specifically rejected Claimant's contention that he suffered from any disabling symptoms of COVID-19 because Claimant's subjective complaints were not corroborated by the medical evidence. For example, Claimant denied a history of balance issues, dizziness, fainting spells, memory loss, numbness, tingling, anxiety, or difficulty sleeping when he met with Dr. Sammartino, but later testified to having many of those symptoms. The WCJ found that Claimant's active law licenses in Pennsylvania and New Jersey belied his claims that he was not mentally capable of working as a registered nurse. Claimant failed to follow up with Penn Medicine's COVID-19 clinic, as Dr. Temple recommended. Claimant's testimony that he could not work in any capacity was contradicted by Dr. Temple's release to work, with restrictions. Additionally, Claimant's alleged disability was contradicted by the surveillance video footage that showed Claimant performing a variety of activities without difficulty.

A WCJ's credibility determinations are due substantial deference, and such determinations may only be overturned if they are "arbitrary and capricious or so fundamentally dependent on a misapprehension of material facts, or so otherwise flawed, as to render [them] irrational." *Casne v. Workers' Comp. Appeal Bd. (Stat Couriers, Inc.)*, 962 A.2d 14, 19 (Pa. Cmwlth. 2008). It is not the role of this Court to reweigh the evidence or substitute its judgment for the credibility determinations made by the WCJ. *Rissi v. Workers' Comp. Appeal Bd. (Tony DePaul & Son)*, 808 A.2d 274, 279 (Pa. Cmwlth. 2002). We decline to overturn the WCJ's credibility

15

determination here, as her rationale for rejecting Claimant's testimony was neither arbitrary or capricious but was instead thoroughly explained and supported by the record.

## B. Sufficiency/Competency of the Evidence

Next, Claimant argues that the WCJ's decision was based on factual errors and a poor understanding of Long COVID. Claimant contends that the WCJ should have considered the "rapidly evolving understanding" of Long COVID patients as expressed in "the public record" and in "reputable government sources[.]" Claimant's Br. at 17. In affirming the WCJ, Claimant suggests that the Board erred in failing to consider this "new competent scientific evidence[.]" *Id.* at 16.

Section 418 of the Act relevantly provides that the WCJ "shall make . . such findings of fact [and] conclusions of law . . . as the petition and answers and the evidence produced . . . require." The WCJ is the ultimate finder of fact and the exclusive arbiter of credibility and evidentiary weight. *Lindemuth v. Workers' Comp. Appeal Bd. (Strishock Coal Co.)*, 134 A.3d 111, 125 (Pa. Cmwlth. 2016). In executing her role as factfinder, the WCJ is free to accept or reject, in whole or in part, the testimony of any witness. *Id.* It is irrelevant whether the record contains evidence to support findings other than those made by the WCJ; the inquiry before this Court is whether substantial evidence exists to support the findings actually made. *Minicozzi v. Workers' Comp. Appeal Bd. (Indus. Metal Plating, Inc.)*, 873 A.2d 25, 29 (Pa. Cmwlth. 2005). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *City of Philadelphia v. Workers' Comp. Appeal Bd. (Kriebel)*, 29 A.3d 762, 769 (Pa. 2011).

When performing a substantial evidence analysis, this Court must view the evidence in a light most favorable to the party that prevailed before the factfinder.

16

*Hoffmaster v. Workers' Comp. Appeal Bd. (Senco Prods., Inc.)*, 721 A.2d 1152, 1155 (Pa. Cmwlth. 1998). We must also draw all reasonable inferences deducible from the evidence that supports the factfinder's decision in favor of the prevailing party. *Id.* Furthermore, workers' compensation appeals "are taken on the basis of the record produced before the [WCJ]," which is limited to the petition, the answer, and the evidence. *Gen. Elec. Co. v. Workmen's Comp. Appeal Bd. (Valsamaki)*, 593 A.2d 921, 923 (Pa. Cmwlth. 1991). On appeal, this Court must limit its consideration to "those facts that have been duly certified in the record[.]." *B.K. v. Dep't of Pub. Welfare*, 36 A.3d 649, 658 (Pa. Cmwlth. 2012). Thus, "[f]or purposes of appellate review, that which is not part of the certified record does not exist." *Id.*

We must reject Claimant's argument that the WCJ should have considered extrajudicial scientific evidence, as it ignores the plain language in Section 418 of the Act. It was Claimant's responsibility to introduce any "known science" that would have refuted Dr. Bennett's expert opinions. He did not. This Court will not upend the WCJ's decision, or the Board's affirmance thereof, based on matters outside the certified record.

As part of his challenge to the WCJ's findings, Claimant contends that Dr. Bennett's testimony that Claimant had fully recovered was equivocal and incompetent to support the termination of his workers' compensation benefits. In support of his argument, Claimant points to Dr. Bennett's initial IME report dated April 28, 2021, that indicated Claimant could work with restrictions. After reviewing the video surveillance footage, however, Dr. Bennett revised his opinion, stating that Claimant had "achieved full recovery[,]" that Claimant did not require further treatment or testing for COVID-19, and that Claimant could return to work as a registered nurse "without restrictions[.]" C.R., Item No. 28. In addition to these

17

competing opinions, Claimant questions Dr. Bennett's expertise in Long COVID. Claimant rejects Dr. Bennett's interpretation of the surveillance video footage, which Claimant asserts only depicts a "slow-moving old man with a limp[.]" Claimant's Br. at 20. Claimant maintains that he has been consistent regarding the myriad of symptoms from which he continues to suffer, and Claimant's ability to walk into a store does not prove that he has fully recovered from COVID-19. Claimant further cites Dr. Bennett's failure to state that his revised opinion in the May 24, 2021 IME report was made "within a degree of medical certainty" as a reason to reverse the Board. Because Dr. Bennett is "not a [workers' compensation] doctor," Claimant insists that he was never released to work without restrictions. Claimant requests that Dr. Bennett's opinions be "thrown out" and this matter remanded for a new determination by a different, "unbiased" WCJ. Claimant's Br. at 30.

A medical expert's testimony is unequivocal if, after providing a foundation, the expert testifies that he believes or thinks the facts exist, and the result in question came from the assigned cause. *Bemis v. Workers' Comp. Appeal Bd. (Perkiomen Grille Corp.)*, 35 A.3d 69, 72 (Pa. Cmwlth. 2011). The law does not require every utterance from a medical expert to be certain, positive, and without reservation or exception. *Id.* The use of words such as "likely" will not render an expert opinion equivocal provided that the testimony, when read in its entirety, is unequivocal and the witness does not recant the opinion or belief first expressed. *Id.* Omission of the phrase "within a reasonable degree of medical certainty" does not render a medical expert's testimony or opinion incompetent. *Williams v. Workmen's Comp. Appeal Bd. (Montgomery Ward)*, 562 A.2d 437, 440 (Pa. Cmwlth. 1989). A medical expert's testimony, reviewed as a whole, is equivocal if it is based only upon

possibilities, is vague, and leaves doubt. *Kurtz v. Workers' Comp. Appeal Bd. (Waynesburg Coll.)*, 794 A.2d 443, 449 (Pa. Cmwlth. 2003).

Additionally, a medical opinion may be rendered incompetent when made by a medical professional who lacks a complete grasp of the medical situation and/or the work incident. *Long v. Workers' Comp. Appeal Bd. (Integrated Health Serv., Inc.)*, 852 A.2d 424, 428 (Pa. Cmwlth. 2004). A medical expert's opinion is not rendered incompetent, however, unless it is *solely* based on inaccurate or false information. *Am. Contracting Enters., Inc. v. Workers' Comp. Appeal Bd. (Hurley)*, 789 A.2d 391, 396 (Pa. Cmwlth. 2001). The opinion of a medical expert must be viewed as a whole, and inaccurate information will not defeat an expert's opinion unless it is *solely* dependent on those inaccuracies. *Id.* Additionally, where a medical expert testifies solely by deposition, the WCJ must support his credibility determinations with something more than a mere announcement that one expert is more credible than another. *Daniels v. Workers' Comp. Appeal Bd. (Tristate Transp.)*, 828 A.2d 1043, 1053 (Pa. 2003). In that circumstance, the WCJ must offer "some articulation of the actual objective basis for the credibility determination." *Id.* Unless made arbitrarily or capriciously, a WCJ's credibility determinations will be upheld on appeal. *Green v. Workers' Comp. Appeal Bd. (US Airways)*, 28 A.3d 936, 940 (Pa. Cmwlth. 2011).

We are unpersuaded by Claimant's challenge to the competency of Dr. Bennett's expert testimony and opinions. Claimant is correct that Dr. Bennett initially opined that Claimant could return to work with restrictions. After viewing the video surveillance footage, which was admitted without objection by Claimant or his counsel, Dr. Bennett provided a supplemental IME report, in which he opined that Claimant had fully recovered from COVID-19 and could return to work in an

19

unrestricted capacity. Dr. Bennett's omission of the phrase "within a reasonable degree of medical certainty" did not render his testimony or opinion incompetent was not required to state his opinion within a reasonable degree of medical certainty. Dr. Bennett's failure to accept Claimant's subjective symptoms, which the WCJ rejected as not credible, does not render his medical opinions invalid or suggest that Dr. Bennett did not have a complete grasp of Claimant's medical situation. Rather, Dr. Bennett simply did not agree with Claimant and Dr. Temple that Claimant suffered from Long COVID, based on his physical examination of Claimant and his review of Claimant's medical records and the April 2021 and June 2021 video surveillance footage.

The WCJ explained in detail why she favored the opinions of Dr. Bennett over those provided by Dr. Temple. More specifically, while Claimant did not report to Dr. Temple that his symptoms had improved, Dr. Temple released Claimant to work in a modified-duty capacity, which suggested that Claimant possessed the cognitive functioning required of a registered nurse. Dr. Bennett's opinion that Claimant had fully recovered from COVID-19 was supported by the objective surveillance video footage that showed Claimant participating in various activities of daily living, such as operating a motor vehicle, performing yard work, and shopping, without any visual evidence of balance issues. Claimant's disagreement with Dr. Bennett's opinion and his desire for a different outcome is not a sufficient basis for overturning the WCJ's findings of fact and credibility determinations.

## IV. Conclusion

By failing to object to the admission of social media posts, Claimant has waived any objection to their admission on appeal. The WCJ's finding that Claimant had fully recovered from COVID-19 is supported by substantial evidence, including

20

the competent and unequivocal testimony and opinions of Dr. Bennett. Accordingly, we affirm the Board.

_____

ELLEN CEISLER, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Joseph Pfeifer,  :
               Petitioner  :
  :
      v.  : No. 755 C.D. 2023
  :
Temple University Hospital, Inc.  :
(Workers' Compensation Appeal  :
Board),  :
             Respondent  :

## **O R D E R**

AND NOW, this 18th day of October, 2024, the May 23, 2023 order of the Workers' Compensation Appeal Board is hereby AFFIRMED.

 

ELLEN CEISLER, Judge